Good morning, Your Honors, and may it please the Court, A.J. Plowman for the appellate. The issue before the Court today is whether it was abuse of discretion for the District Court to award a preliminary injunction in favor of WorldVue. Three reasons warrant reversal. WorldVue did not establish a substantial likelihood of success on the merits. WorldVue did not demonstrate imminent or recordable harm. And the preliminary injunction is overbroad. It imposes what is tantamount to a no-hire provision, which has no basis in the parties' contract. Turning to the first issue, WorldVue failed to establish a substantial likelihood of success on the merits because its contract claim is based on an erroneous interpretation of the contract. When appellants separated with WorldVue, they entered into a series of agreements. The Dutch group entered into a confidential settlement agreement. Mr. Shannon Griffin entered into a confidential separation and transition services agreement. Both agreements contain non-solicitation language, which prohibits appellants from soliciting the employees and independent contractors of WorldVue in a restricted area. The threshold issue before the Court today is what it means to be in a restricted area. It seems to me to be a plain violation of the contract. It seems to me that's the easiest question in the case. You need to explain that with some care. Of course, Your Honor. Appellants give the word in the meaning that it is a reference to the physical location of the worker. This is consistent with the Texas Mutual Insurance case versus Hooper, in which the Texas Court of Appeals would often consider what it means for an employee to be recruited and hired in Texas. There, the Court found that it was the employee's location when the employee is hired that is what is interpreted. That is consistent with the appellant's interpretation of non-solicitation provision. The agents, the customer service agents at issue, WorldVue employs 26 that are physically located in the restricted area. These 26 individuals in the restricted area are the individuals that appellants agreed not to solicit, and appellants have complied with that obligation. There are more than 100 customer service agents who physically live and work outside the restricted area. But they supported call center support services to clients located within the restricted area in the United States. That's right, Your Honor. But all of WorldVue's customer service agents provide services to customers in the restricted area. So if the reference to in in their non-solicitation provision is really a reference to the location of the customers, there's no reason to include the restricted area limitation because the solicitation provision would have the same meaning with or without that reference to the restricted area. WorldVue's interpretation relies on the injection of additional language into the contract. And you can see that on page 14 of the appellant's opening brief, where we compare the contract language in the Dutch agreement non-solicitation provision to the language that WorldVue presented to the district court in the preliminary injunction, which the court ultimately accepted. WorldVue's interpretation relies on the injection of performed work in language, which is included in the contract. If WorldVue wanted the location of the customer to be the restriction or for the in in the restricted area to be a reference to the customer, they could have negotiated for such a provision that would have included all of WorldVue's workforce. But that's not what they did here. It would have been so easy for WorldVue to negotiate for a non-solicitation provision that extended to all of its independent contractors and employees who perform services for customers in the restricted area with whom appellants have worked in the previous year or two years. I think that would be consistent with the company's not-to-compete act. But because that's not what they negotiated for and they now rely on this injection of additional language, the non-solicitation provision as they interpreted it is not consistent with the company's not-to-compete act because this limitation to the restricted area is effectively meaningless as it is now as the court interpreted it below. WorldVue's non-solicitation provision extends to its entire workforce worldwide. Appellants are prohibited from working with individuals in Mexico and the Philippines who have never been in the restricted area. WorldVue failed to establish a substantial likelihood of success on the merits for a second reason. The non-solicitation provision is limited to independent contractors. I have a question. It carved out a certain number of employees and I cannot remember. What does the record say about did they live in or at the restricted area? Those individuals that the Zuch group carved out lived and worked in the restricted area. And the testimony from Jason Zuch at the preliminary injunction hearing was that he carved out those individuals specifically because he knew they lived and worked in the restricted area and he didn't need to carve out the customer service agents because he didn't believe at the time they were entering into the contract that those individuals would fall within the scope of the non-solicitation provision. And as I was saying, the non-solicitation provision is limited to the employees and independent contractors of WorldVue. The customer service agents in dispute are not employees or independent contractors of WorldVue. The Texas Covenant's not-to-compete act requires that a non-solicitation provision be limited in scope to time, geographic area, and scope of activity. It has to be reasonably limited in a way that protects the business interest of the employer. But WorldVue's interpretation, which extends the scope of the non-solicitation provision to not only its employees and its independent contractors, but also the independent contractors of its independent contractors, extends the scope of the non-solicitation provision too far to be consistent with Section 1550 of the Texas Business and Commerce Code. Now turning to the issue of a reckless harm. The harms alleged by WorldVue do not support a preliminary injunction. WorldVue focused on past rather than imminent harms. Chief, WorldVue focused on the solicitation of four customer service agents, which took place in October 2024 or earlier. And at the preliminary injunction hearing, Mr. Thomas Satcho, the CEO of WorldVue, testified he was not aware of any ongoing solicitations. Instead, WorldVue relied on speculatives rather than probable harms. There was, though, a stipulation that a breach of the contract is irreparable harm. Is that right? That is right, Your Honor. And my reading of the injunction order is that Judge Boyd did give that stipulation considerable weight. But there is an issue with that, and in the cases we've cited, several courts have rejected this approach. Preliminary injunctions are an extraordinary remedy, and they are not awarded as a matter of right. So if parties cannot stipulate to the entry of an injunction, to hold otherwise would divest a federal court of the discretion to deny an injunction. You are, of course, right that the district court considers all the factors, and the judge uses his or her discretion to decide what the result of those factors should be to grant or deny. But that doesn't mean that the parties can't stipulate as to one of the elements that the district court considers. Perspectively, Your Honor, I'd have to push back on that. I think that's what the case law suggests. The case law that we cited, the Bull Acquisitions, Merritt Hawkins, Traders International, and Yellowstone Landscape cases, in each of these cases, the applicant for injunctive relief, like worldview, relied on a contract provision to establish one of the elements of injunctive relief, whether it was irreparable harm or a different element. And in each of these cases, the court rejected these efforts to treat contract provisions as outcome determinative. At most, the courts found that these stipulations are some evidence of irreparable harm, but they are not on their own evidence of irreparable harm. There must be some other evidence of irreparable harm, and here, we don't have that. Worldview relied on speculative harms. Mr. Padre stated at the preliminary injunction hearing, well, if four customer service agents turns into 20, it could affect worldview's ability to perform services for its customers. And if worldview can't perform services for its customers, then that could affect worldview's reputation. But this speculation on top of speculation is not enough to equate to a reasonably certain threat of imminent harm. The evidence here showed that there were no customer complaints. Both Mr. Faggio and Mr. Mark Schatz, another representative of worldview, stated that they had not received any complaints from customers due to the departure of four customer service agents. They had also reported that they didn't have any issues servicing their customers after the departure of these four agents. And while Mr. Faggio stated on the stand at the hearing that he had concerns about productivity losses and training costs, when asked if worldview had replaced these individuals and if there had been no disruption at all due to the replacing of these individuals, he didn't know. So his concerns, his stated concerns about productivity losses were mere conjecture. And with respect to training costs, Mr. Mark Schatz testified that he could calculate productivity losses and costs associated with recruiting and training, replacing third-party workers. Worldview relies on several cases for the contention that a highly trained employee's breach of the non-compete gives rise to a rebuttable presumption of irreparable harm. But these cases are distinguishable. In all of these cases, the departing employee left to work for a direct competitor. And in those cases, there is a greater threat that the departing employee will solicit the former employer's customers, or that the departing employee will use the former employer's confidential information to the detriment of the former employer. But that is not an issue here. Mr. Faggio conceded at the hearing that appellants are not competing with worldview in the restricted area. He further conceded that appellants are not stealing customers from worldview. Further, on the issue of irreparable harm, any finding that is based on appellants' alleged use of worldview's confidential information is erroneous. The information at issue, information about customer service agent identities, pay, skill level, this is not worldview's confidential information. This is information that appellants have developed over the course of more than 20 years. And worldview has not been able to identify any contract provision in which appellants transferred this information to worldview. In fact, at the hearing, the court has acknowledged that this is not confidential information. This information is in the heart of Mr. Jason Faggio. He's known these employees for so many years. Finally, the last point I'd like to make is that the preliminary injunction is too broad. It imposes what is tantamount to a no-hire provision. The injunction bars appellants from contracting with, compensating, or using the services of 11 named individuals. Because the no-hire provision prohibits appellants from not only soliciting, but hiring these individuals, this provision imposes a greater restriction than what is provided for in the contract. For example, one of these named individuals is fired by worldview and seeks employment with an appellant. Appellants cannot hire that individual. So not only is it broader than what's provided for in the contract, it expressly contravenes a contractual provision in the Dutch agreement. Has that happened? Has that happened? Not that I know of. As far as solicitations go, I only know about the solicitations of the four individuals, Damian Junez, Daniela Cabos. Well, if they were terminated, it doesn't seem like they're an employee at the time they're then subsequently solicited, right? That's exactly right, and that's my interpretation of what would be permissible under the non-solicitation provision as it's written. But under the permanent injunction, if one of these individuals were terminated by worldview, and I don't know that they have been, appellants wouldn't be able to hire them just because of what is provided for in the injunction. But this injunction, this no-hire provision, is inconsistent with the Dutch agreement, which expressly states that the Dutch group may recruit an individual whose employment is terminated by worldview or its affiliates. So in granting this portion of the preliminary injunction, the district court granted worldview a better bargain than what worldview was able to secure at the negotiating table. I see that I'm about out of time for this first 15 minutes, so unless there are any questions, I'll give that time back. You've saved time for about. Thank you, Ms. Forman. Thank you. Mr. Coburn? Thank you, and good morning. May it please the court. Worldview and the Dutch group are both in the business of providing technical support for hotels. For decades, the Dutch group built a global network of hand-picked technicians and turned them into a world-class support team. And then over the last three years, the Dutch group agreed to a series of contracts to transfer that business to Worldview in exchange for over $15 million. But as soon as it received the money, the Dutch group launched a secret, pre-planned effort to dismantle the very business that it had just sold to Worldview. When Worldview sued, the Dutch group argued, and it still argues today, that what it actually sold Worldview was a support business without the support. The district court correctly rejected that reading of the contracts, and it entered a preliminary injunction enforcing two provisions of the party's agreements at issue here. A one-year non-compete provision that expires on October 11th of this year, and a non-disclosure provision which has no expiration. The Dutch group focused its interlocutory appeal on the first provision, the non-compete, but it never moved to expedite this court's review. So we're now at argument just weeks before the expiration of the non-compete provision, and at this point, we don't think that there's really any practical relief that the court can provide for the Dutch group as to the non-compete. So that issue may be moot, and may not need to be reached. Nevertheless, we certainly argue and agree with the district court's reading of the contract, and would ask the court in the alternative to affirm that interpretation. But the issue that is not going to be moot on October 11th is the enforceability and the district court's interpretation of the non-disclosure provision, and that will remain in effect. And I'm, of course, happy to answer any questions about the non-compete, but what I plan to do is spend my time focused on the non-disclosure provision, since that will remain in effect after October 11th. Now, I think there's three key reasons why the court should affirm the injunction as to the non-disclosure provision, and the first is that the use of the confidential information is not disputed. There's a dispute over whether it's confidential, but the use of that information is not disputed. The Dutch group does not dispute that it used, and intended to continue using after an adjunctive relief, what the district court called information in their recruitment process, page 1038 of the record. The parties agree that the specific information at issue are the identities, compensation, and skill levels of these employees and independent contractors that were serving Worldview's customers. And the evidence of use is quite clear. I think if the court looks particularly at page 1916 through 1920, 1835, there's emails going back and forth from Dutch group employees around the time that the 2024 agreement was entered, using specific information about the compensation of these independent contractors at Worldview, let's pay them a little bit more than what Worldview's currently paying them so that they'll be attracted to come over. All of that information was used to bring them over to Dutch group right after what Jason Dutch said, the cash was in the bank. As soon as the cash was in the bank, wait until the cash is in the bank, but as soon as the cash is in the bank, pull all my guys out. Now, the only disputed issue on the merits for the non-disclosure provision is whether the information was protected, whether it was confidential. That's the only argument they're making on the merits. And what I would do is point the court to section five of the 2024 agreement, definition of confidential information. And I would note that the only exception to confidential information actually places the burden on the Dutch group to demonstrate, that's the language of the contract, to demonstrate in section 5C that the information is in the public domain. And there's no evidence in the record, there's no evidence before this court that Worldview's contractor identities, compensation, skill levels was in the public domain. The only evidence that the Dutch group is pointing to is testimony from Jason Dutch stating that you could go to Caltech's website, the third party staffing agency, and you can find their level, their skill level. We don't know what he's referring to. That's not in the record. There's no cut out of the website to show what that is. But even if that's true, that does not capture the information that was being used by Dutch group. That was only known inside the company. This is information that's valuable to competitors. It's not known to competitors. What Worldview is paying its support team, who these people are. And that really was a key aspect of the transaction that occurred in 2022. That was part of the consideration. It was the support team that was handpicked. Jason Dutch said he spent decades building this support team. These contractors were Worldview's contractors. Worldview did specifically mention its contractor information in the 2024 agreement as its intellectual property. We've cited that in our brief. It's in tab four of our record excerpts, Apelli's record excerpts, page 1745. Worldview specifically identified contractor information. And the only response we see in the reply brief is that, well, Dutch group also identified its contractor information. The problem with that argument is that they were Worldview's contractors, not Dutch group's contractors in 2024. The Caltech agreement, page 1935, specifically states that these workers are not to be used for any other services for any person or entity other than Worldview. And that was exactly what Jason Dutch understood the transaction to mean. He stated at page 1260 that the Caltech contractors were performing work for Worldview as independent contractors. So these contractors worked solely for Worldview. When Worldview identifies its contractors as its intellectual property in that agreement in 2024, that is a specific reference to what Worldview considered confidential information and the information that was then used, undisputedly used, by the Dutch group. And there's no dispute that this is precisely the kind of information that's protected under Texas law. We've cited cases in our brief about this. We've not seen a response to that in the reply. So really the issue, the only disputed issue on the merits for purposes of the nondisclosure is whether the information is protected. We think the district court's finding that it was is well supported. And then finally, the third reason the court should affirm, at least as to the nondisclosure agreement, there's particularly strong evidence of irreparable harm in this case. We don't just have a stipulation to irreparable harm. We have an express waiver. All of the cases that the appellants are citing about contractual stipulations of irreparable harm, they're just dealing with stipulations. I haven't seen a case that's dealing with the enforceability of a waiver, of an explicit waiver. So I don't think that there's any authority they've cited that says that that is somehow unenforceable. It's really no different than had they just simply not contested irreparable harm in the district court, and this court would be applying its own waiver rules to find that they can't contest it now. They explicitly waived it in the contract, so the court really doesn't have to reach the record on that point. But if it does, there's particularly strong evidence of harm in this case. You have text messages from Jason Zuch to his employees at the time of the 2024 agreement where he's telling his employees who are recruiting Worldview's workforce that Worldview is going to be out of Wi-Fi in less than a year. And when he was asked about this at the injunction hearing, by the way, that's 1870 of the record. When he was asked about this at the injunction hearing at page 1250 and 51 of the record, he confirmed that he was making a prediction that Worldview would be out of business in a year. Again, this is in the context of recruiting Worldview's workforce. He agreed that his plan, absent injunctive relief, was to continue to solicit these employees, these workers, and obtain the services of members of the Worldview support team without limitation. So there's clearly a substantial risk of irreparable harm by Zuch group's own admission. And I would just ask the court to keep in mind the context of this business. This is the support—technical support business for hotels requires 24-7 report. If the Wi-Fi goes out in your hotel room, you need somebody to call to get the Wi-Fi back up online. And there is testimony in the record that Worldview has 8,000 individual contracts that are not long-term contracts. These are contracts that can be terminated by their clients if they can't meet certain response timelines, if they can't get the Wi-Fi back on quickly. So it's a very sensitive business in that regard. And the risk of irreparable harm, particularly if they can't service these clients, we think is well established. And I would just finally note that 80 percent—I think it's undisputed that 80 percent of the Worldview workers were outside of the country, outside of the restricted area. But all served employees and clients inside the restricted area. So that doesn't just go to what the parties understood the agreement to be about in 2024. It also shows the risk of irreparable harm if 80 percent of the contractors are now at risk. Unless the court doesn't have any further questions, we would submit the rest of our time. All right. Thank you, Mr. Coburn. Ms. Foreman for rebuttal. Can you speak, first of all, to this mootness question that Mr. Coburn mentioned? Of course, Your Honor. I disagree with the statement that there is no practical relief that the court can afford at this point. The preliminary injunction first doesn't have an end date currently. So unless World Accountants seek additional relief from the court, it is going to continue into perpetuity. I don't mean to interrupt you. I didn't give you a chance to answer the question. But what he said was, so the non-compete provision expires on October 11th and may be moot. But the non-disclosure provision remains in effect, so there's no mootness issue. Is that an accurate statement as to both of those? Yes, it is. Yes, I agree with that statement. But even after the non-solicitation provision expires, World Bistro maintains a breach of contract claim against accountants based on its interpretation of the non-solicitation provision. So even though they will not be entitled to equitable relief, they're still seeking attorney's fees against accountants for accountants' alleged breach of that provision, which is why it is important to have the court's interpretation on the meaning of in in that provision. Turning to the consideration that underscores the 2022 transaction, World Bistro places a lot of emphasis on the customer service agents in the workforce. But that is not what Worldview purchased from accountants. Worldview purchased a book of business, accountants' domestic list book of business, which included contracts with approximately 3,000 hotels. Worldview also purchased a control panel, some of accountants' intellectual property. But they did not purchase the workforce. Worldview has always known that accountants were going to continue their international business and use these customer service agents to support that business. In fact, in accountants' employment agreements with Worldview in 2022, there were express cutouts to allow accountants to continue using that international business, and the contracts also provided for accountants to use these customer service agents to support that business. Let me ask you just procedurally where this case is. Again, I apologize for interrupting you, but I want to be sure I understand. This is an appeal only from the order on the preliminary injunction, is that right? That's right. Whether we affirm that or reverse it, there's still a case on the merits. Is that right or do I misunderstand? That's right, Your Honor. There is still a case on the merits, and it includes Worldview's recent contract claim and several other claims against Ellis. All right. So all we're ruling on and all we have jurisdiction to rule on is whether the district court abused its discretion on the order regarding the preliminary injunction. That's right, Your Honor. But it does have implications for the rest of the case. Well, certainly we would address likelihood of success in all the factors, I suppose. Yeah, all right. But we couldn't do that after October 11, could we? You could, Your Honor, because the preliminary injunction doesn't become a moot immediately on October 11 because it doesn't currently have an end date. So regardless of what the contract says, until accountants are able to secure additional relief on the district court, the preliminary injunction continues. Well, and it's live as to the confidentiality issue. Yes, and the confidentiality issue, I mean, the nondisclosure provisions, like Mr. Coburn said, those are obligations that will continue in perpetuity. The preliminary injunction states that accountants have used Worldview's confidential information, but it's unclear what that confidential information exactly is. Mr. Coburn stated that the parties agreed that it's information about these custom insurance agents, but it took accountants quite a difficult journey to come to that conclusion, and it was only after the questions asked at the preliminary injunction indicated that that's the information that they believed to be their confidential information that accountants were able to come to that conclusion because they had used such ambiguous language for so long about what the confidential information is. I want to get pretty precise about that. They seem to be saying the identities of the employees and independent contractors is confidential information. That's right. But you're saying they were permitted to use those same employees and independent contractors in their international business, even after such a tariff was brought out? Yes, that's right. And I see my time's up, so I'll... Well, I interrupted you a good bit on your rebuttal. If you'd like to have one more minute, if there's anything else that you didn't... Don't just repeat yourself, but if you have something else you want to cover. Thank you, Judge. I just want to address the confidential information issue briefly. There is a dispute about whether that information belongs to accountants or Worldview. Accountants have always maintained that they did not transfer this information to Worldview as part of the transaction. If you look at Exhibit B to the 2024 Purchase Agreement, it expresses that accountants maintained the information and relationships related to their contractors and employees, individuals that they've been working with for up to 20 years. For all of these reasons, we strongly feel that reversal is appropriate by the court.